Slip Op. 02 - 124

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                    :

                              Plaintiff, :
                                              Consolidated
             v.                          :  Court No. 96-02-00608

YUCHIUS MORALITY COMPANY, LTD. and      :
INTERCARGO INSURANCE COMPANY,
                                         :
                              Defendants.
- - - - - - - - - - - - - - - - - - - -x


Opinion & Order

[Upon trial of the violations alleged per
 the Tariff Act of 1930, judgment for the
 plaintiff and the defendant/cross-claimant.]


                              Decided: October 18, 2002


     Robert D. McCallum, Jr., Assistant Attorney General; David M.
Cohen, Director, Commercial Litigation Branch, Civil Division, U.S.
Department of Justice (A. David Lafer and Kenneth S. Kessler); and
Office of Associate Chief Counsel, U.S. Customs Service (Annmarie
R. Highsmith), of counsel, for the plaintiff.

     Sharma & Bhandari (Onkar N. Sharma); and S.J. Christine Yang,
of counsel, for defendant Yuchius Morality Company, Ltd.

     Sandler, Travis & Rosenberg and Glad & Ferguson, P.C.  (T.
Randolph Ferguson); and John M. Daley, of counsel, for defend-
ant/cross-claimant Intercargo Insurance Company.


     AQUILINO, Judge:  It is time for the court finally to

draw to a close this case brought pursuant to 19 U.S.C. §1592 and

28 U.S.C. §1582 and which consolidates plaintiff's complaint

against Yuchius Morality Company, Ltd. for unpaid duties and for

penalties in connection therewith and its complaint against

Intercargo Insurance Company, as surety for such duties.

I

As set forth in the court's slip opinion 99-79, 23 CIT 544 (1999), familiarity with which is presumed, this action has followed in the aftermath of hundreds of entries from Hong Kong, China, Taiwan, and Indonesia over a number of years, during which the U.S. Customs Service came to conclude that they entailed violations of the Tariff Act of 1930, as amended. Agency investigation of those entries, and the resultant administrative process, culminated in commencement of the two cases consolidated herein. Subsequent to its joinder of issue, defendant Yuchius interposed a motion for summary judgment on the ground that plaintiff's claims were time-barred. The plaintiff countered with a cross-motion for summary judgment on its claim for the unpaid duties, and defendant Intercargo moved for summary judgment on its cross-claim "for exoneration and reimbursement against defendant Yuchius"[1].

Slip opinion 99-79 denied defendant Yuchius's motion and also that of the other defendant, albeit the latter "without prejudice to grant upon entry of judgment herein against the surety and recovery thereon by the plaintiff." 23 CIT at 548, citing United States v. Almany, 22 CIT 490, 496 (1998). That opinion granted plaintiff's cross-motion for recovery of the unpaid duties and also ordered the parties to trial, primarily on plaintiff's

---

[1] The court's jurisdiction over this claim is pursuant to 28 U.S.C. §1583.

allegations of negligence within the meaning of 19 U.S.C. §1592 on the part of Yuchius Morality Company, Ltd.

That defendant did not controvert the statement of the material facts as to which the plaintiff contended there was no genuine issue to be tried and that was filed in conjunction with its cross-motion for summary judgment. Whereupon those facts were deemed admitted. See 23 CIT at 546, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed.Cir. 1987); United States v. Continental Seafoods, Inc., 11 CIT 768, 773-74, 672 F.Supp. 1481, 1486-87 (1987). They included the following:

1. During the five year period encompassing fiscal years 1988 through 1992, Yuchius made approximately 1,600 entries with an estimated entered value of $50 million. . . .

2. Yuchius failed to maintain adequate or sufficient records to determine the actual price paid or payable for the merchandise it imported into the United States during fiscal years 1988-1992. . . .

3. For fiscal year February 1, 1991 through January 31, 1992, Yuchius . . . undervalued its importations by $4,228,896. . . .

4. Yuchius' $4,228,896 undervaluation for [that] fiscal year . . . resulted in a loss of revenue to the Government of approximately $248,125, which Yuchius has since remitted to the Government. . . .

5. For fiscal years 1988-1992, Yuchius' own records show that the value of the imported purchases totaled $59,-944,282 and that Yuchius declared to Customs that the value of that same merchandise was only $49,691,820. . . .

*   *   *

7. Yuchius' undervaluation for the four fiscal years
begining February 1, 1989 resulted in a loss of revenue
to the Government of $576,790, including a loss of duties
to the United States in the amount of $549,642; harbor
maintenance fees of $10,224; and merchandise processing
fees of $16,923. . . .

8. Yuchius has stipulated that the Government lost
$539,202 as the result of Yuchius' undervaluations of
imports. . . .

9. Yuchius owes the Government $328,665 in outstanding
duties and fees, representing the difference between the
total owing from Yuchius' undervaluation of its imports
during the four fiscal years beginning February 1, 1989
and the payments already made by Yuchius to the Govern-
ment. . . .

10. Yuchius has refused to pay the $328,665 in outstand-
ing revenue rightfully due to the Government.

23 CIT at 545-46.

Trial of the remaining issues took place in an expedi-
tious manner. Subsequent thereto, the parties sought and were
granted a number of extensions of time to continue attempts to sort
out among themselves those issues and/or to prepare and file post-
trial proposed findings of fact and conclusions of law.

A

The parties' papers finally submitted do contain such
proposed findings and conclusions. In addition, those filed on
behalf of defendant and cross-claimant Intercargo Insurance Company
include a settlement agreement entered into between it and the
plaintiff wherein, among other things, the government

acknowledges and agrees that payment of the Settlement
Amount extinguishes all obligations owed under the

$50,000.00 continuous bond posted by Intercargo for the benefit of defendant Yuchius Morality Co., Ltd.  . . .

and

acquits and forever discharges Intercargo of and from any and all claims, . . . causes of action, rights, damages, costs, expenses, compensation, consequential damages, loss of profits and any other thing whatsoever which the United States has or could have asserted concerning the subject matter of the action.[2]

That agreement specifically excludes plaintiff's "continuing pursuit of its claims against defendant Yuchius"[3], as well as defendant Intercargo's

continuing pursuit of its cross-claim against cross-defendant Yuchius . . . or [] seeking recovery from or taking appropriate action against Yuchius Morality Co., Ltd. with respect to any other claims it may have against that entity.[4]

Proof of satisfaction of the agreement also has been tendered.[5]

II

The pretrial order stipulated the following herein between the plaintiff and defendant Yuchius:

13. The corrected calculation of net lost revenues, prorated to reflect a reduction for all entries for which the statute of limitations has now run, is $321,306. This figure represents the difference between the total amount of duties for which the statute of limitation has

---

[2] Declaration of John M. Daley re: Relevant Post-Trial Events, Exhibit A, paras. 4 and 5.

[3] Id., para. 7, p. 2.

[4] Id., para. 7, pp. 2-3.

[5] Compare Declaration of John M. Daley re: Relevant Post-Trial Events, para. 5 with id., Exhibit B.

not run, $569,431, and the amount of duties Yuchius has already paid [] $248,227.  . . .[6]

14. The parties stipulate that the loss of revenue stipulated to in no. 13, above, has been calculated based upon the 1395 consumption entries identified on the attached exhibit list.  The parties stipulate to the authenticity and existence of these entries and agree that a complete set of copies of the entry documents need not be introduced or admitted at trial.

Post trial, plaintiff's proposed conclusions of law, *inter alia*, are that defendant Yuchius (a) violated 19 U.S.C. §1592(a) in that (b) it entered merchandise by means of false statements, documents, acts and/or omissions, (c) that those false statements, documents, acts and/or omissions were material, (d) that those shortcomings were due to negligence on its part, and (e) that it had a duty to declare the true price of the merchandise it imported into the United States.  Defendant Yuchius's six proposed conclusions of law include the following:

3.  At the time of the importations involved in this case, an importer's failure to maintain adequate records was not a violation of 19 U.S.C. §1592.

4.  Yuchius' second prior disclosure, dated September 28, 1993, was effective.  Customs erred in denying the second prior disclosure for non-payment of duties.  After the amount of lost duties had been calculated, Customs failed to give Yuchius an opportunity to tender these duties without the assessment of penalties.

5.  Yuchius' first prior disclosure, dated March 24, 1993, was effective.  Therefore, if any penalties

---

[6] Stipulations, of course, are salutary, but, in this instance, the parties' numbers do not quite add up.

are assessed, the maximum permissible amount is $642,306, twice the amount of the loss of revenue in the second disclosure period.

A

The Tariff Act of 1930, in particular as codified as chapter 4, subtitle III, part III (Ascertainment, Collection, and Recovery of Duties) of Title 19 of the United States Code has left little, if anything, to the imaginations of importers into the United States. For example, the first section of that part, 1481, spells out at length the required contents for "[a]ll invoices of merchandise to be imported". Extensive section 1484 stated at the time of the entries herein that any "importer of record"

> (A) shall make entry . . . by filing with the appropriate customs officer such documentation as is necessary to enable such officer to determine whether the merchandise may be released from customs custody; and
>
> (B) shall file . . . with the appropriate customs officer such other documentation as is necessary to enable such officer to assess properly the duties on the merchandise, collect accurate statistics with respect to the merchandise, and determine whether any other applicable requirement of law (other than a requirement relating to release from customs custody) is met.

19 U.S.C. §1484(a)(1) (1988). Next section 1485 requires every importer making an entry under the provisions of section 1484 to file a prescribed declaration under oath regarding the entry. Section 1508 sets forth the required recordkeeping on the part of any importer and entry filer, while section 1509 codifies the authority of the Customs Service to investigate the "correctness of any entry"

> for determining the liability of any person for duty,
> fees and taxes due or duties, fees and taxes which may
> be due the United States, for determining liability for
> fines and penalties, or for insuring compliance with the
> laws of the United States . . ..

19 U.S.C. §1509(a) (1988).   See also 19 C.F.R. §141.86 (1988)

(Contents of invoices and general requirements); 19 C.F.R. §162.1a

(1988)(Definitions); 19 C.F.R. §162.1b (1988)(Recordkeeping); 19

C.F.R. §162.1c (1988)(Record retention period); 19 C.F.R. §162.1d

(1988)(Examination of records and witnesses).

In 1978, Congress amended section 592 of the Tariff Act

of 1930 to make negligence in carrying out the foregoing statutory

and administrative entry requirements subject to imposition of a

civil penalty.  In establishing the jurisdiction of this Court of

International Trade to try *de novo* all related issues, the statute

also provides that,

> if the monetary penalty is based on negligence, the
> United States shall have the burden of proof to establish
> the act or omission constituting the violation, and the
> alleged violator shall have the burden of proof that the
> act or omission did not occur as a result of negligence.

19 U.S.C. §1592(e)(4) (1988).  And the governing regulation at the

time of the first entries in question herein stated:

> *Negligence*. A violation is determined to be negli-
> gent if it results from an act or acts (of commission or
> omission) done through either the failure to exercise the
> degree of reasonable care and competence expected from a
> person in the same circumstances in ascertaining the

facts or in drawing inferences therefrom, in ascertaining the offender's obligations under the statute, or in communicating information so that it may be understood by the recipient. As a general rule, a violation is determined to be negligent if it results from the offender's failure to exercise reasonable care and competence to ensure that a statement made is correct.

19 C.F.R. pt. 171, App. B(B)(1) (1988), quoted with approval in United States v. Hitachi America, Ltd., 21 CIT 373, 380, 964 F.-Supp. 344, 355-56 (1997), aff'd in part, rev'd in part on another ground, 172 F.3d 1319 (Fed.Cir. 1999).

The primary stated position of defendant Yuchius post trial is that while

this case shows that Yuchius' record-keeping was inadequate to support the valuation of its entries, . . . it does not show acts or omissions constituting violations of 19 U.S.C. §1592(a)(1). During the trial in this action the plaintiff added nothing to establish such acts or omissions.[7]

The defendant accepts the above-quoted definition of negligence in arguing that its conduct be compared to that of a "reasonable man" in the same circumstances.[8] On its part, the plaintiff eschews any claim for a recordkeeping penalty, which did not exist by the time of the last entry herein, rather

Yuchius' failure to maintain records to substantiate the prices it claimed to have paid for its merchandise on a per entry basis (records that would have contradicted its own accounting records) clearly reinforces its negligent attitude toward its Customs obligations. Its lack of

---

[7] Proposed Findings of Fact and Conclusions of Law of Defendant Yuchius Morality Co., Ltd. [hereinafter referred to as "Post-Trial Submission of Defendant Yuchius"], p. 8.

[8] See id.

records, no doubt, also contributed to its inability to report the true price of its merchandise.[9]

B

Clearly, the record now at bar does not lend support to the above-stated position of defendant Yuchius that the trial added nothing to the acts and omissions alleged by the plaintiff to have amounted to violation(s) of section 1592. At a minimum, it contributed to the undersigned, sole juror's understanding of them.[10]

(1)

Supplementing the evidence adduced before trial and referred to hereinabove, the plaintiff called to the witness stand a Customs Senior Import Specialist at Los Angeles International Airport who had been a member of the Import Specialist Enforcement Team ("ISET") and the Service's Assistant Field Director of the Customs Regulatory Audit Division ("RAD"), Long Beach, California Field Office. Their interest in Yuchius imports was kindled by an anonymous informant's letter. See Plaintiff's Exhibit 34, p. 020054. On-site investigation was commenced by the ISET member and a RAD auditor. It consisted of interview(s) of the importer and

---

[9] Plaintiff's Proposed Findings of Fact and Conclusions of Law [hereinafter referred to as "Plaintiff's Post-Trial Submission"], p. 20, n. 2.

[10] The transcripts of the trial over three days in January, the 19th, 20th and 21st, have been numbered separately by the court reporters, ergo "Tr." references herein must bear a particular day's numerical prefix, e.g., 21 Tr.

examination of the Yuchius books and records, initially for the year February 1, 1991 to January 31, 1992. The audit was then expanded to cover five fiscal years, 1988 through 1992. Those books and records were found to be inadequate for determination of the actual prices paid or payable for all the merchandise imported. They did indicate a total value of almost 60 million dollars, somewhat less than $50 million of which had been reported to Customs. Those figures were derived by the Service's audit, essentially from tax forms and the general ledger, since individual import invoices and other related documents proved inadequate to the task. See, e.g., 20 Tr., pp. 38, 51.

Defense counsel did not present in open court the president and prime-mover of Yuchius Morality Company or anyone else with direct, relevant knowledge of the transactions at issue.[11] Rather, a certified public accountant brought in by the company after Customs had commenced its investigation was called upon to testify. He explained that he and his staff worked some four hundred hours attempting to "reconcile . . . the Customs dollar amount and Yuchius Morality Ltd.'s dollar amount." 19 Tr., p. 113. That is, Service auditors and he agreed upon a plan of recapitulation and then proceeded on a year-by-year basis to compare company

---

[11] The appearance and testimony at trial of an erstwhile Yuchius underling added nothing of moment. See generally 20 Tr., pp. 167-80.

general ledger purchases with the values reported to Customs upon entry.  See id. at 114-15, 119.

There is no evidence on the record that, as the business of defendant Yuchius expanded, the company made greater effort to properly and fully account for its transactions.  After Customs had commenced its investigation, the defendant tendered $5,138 to cover a variance that had been detected, but it took the position that other questionable entries were attributable to commissions, training, and technical assistance.  Selling commissions, however, had to be included in the price actually paid or payable for imported merchandise.  See 19 U.S.C. §1401a(b)(1)(B) (1988).  Buying commissions, on the other hand, need not have been, but it had to have been demonstrated that there was a bona fide agency relationship and that the commissions were in fact buying commissions.  See, e.g., Rosenthal-Netter, Inc. v. United States, 12 CIT 77, 78, 679 F.Supp. 21, 23, aff'd, 861 F.2d 261 (Fed.Cir. 1988).  To establish the excludability of the latter kind of commission, an importer has been required to show that "none of the commission inures to the benefit of the manufacturer."  Moss Mfg. Co. v. United States, 13 CIT 420, 426, 714 F.Supp. 1223, 1229 (1989), aff'd, 896 F.2d 535 (Fed.Cir. 1990), quoting J.C. Penney Purchasing Corp. v. United States, 80 Cust.Ct. 84, 97, C.D. 4741, 451 F.Supp. 973, 984 (1978).

In this case, the amounts claimed to be commissions had not been listed on the original entry invoices, and they added up

to a significant sum.   See 19 Tr., pp. 53, 62-63.   Customs requested substantiation of them, which defendant Yuchius did not provide.  See id. at 47, 49-50.   The company did not produce any agency agreement.  See id. at 49-50.  Furthermore, the amounts claimed were in excess of 70 percent, and, according to the testimony of the ISET member, normal buying commissions are in the range of five to ten percent.  See id. at 48, 54, 64.  Defendant Yuchius was likewise unable to verify the claimed $586,000 cost of its furniture assembly area, which, according to Customs, was rudimentary and may not have been worth more than twenty thousand dollars.  See id. at 37-39.  When asked about the technical-assistance and third-party-commission claims, the ISET member responded that he found them to be identical,

> which I thought to be unusual that the assembly plant, which was an unrelated issue, the assembly plant, training and so on, would exactly to the dollar equal the third party buying commission.  I also thought that five hundred eighty-six thousand dollars to pay for technical services to train their men to do such a basic task was totally out of line.  I felt that any untrained person maybe with five or ten minute explanation could do that task.

Id. at 50. Defendant Yuchius similarly had no receipts for the claimed deductible training expenses, which the company president claimed he kept in his head.  See id. at 42-43.  None of the adjustments claimed to be nondutiable could be verified against the actual import entries for which they were claimed.  See id. at 52-64.

(2)

Keeping transactions in one's head may be possible, at least so long as no one else demands an accounting thereof, but it is not possible for this court on the record developed in this case to find that such an approach by defendant Yuchius was the kind of care contemplated by 19 U.S.C. §1484(a)(1), supra. That is, it was to be expected that some sixty million dollars worth of entries would give rise to questions and that the answers thereto would require verification. That such confirmation was not even feasible with the intervention of outside accountants and lawyers on both sides is perhaps the best indication of negligence. Indeed, the court finds that defendant Yuchius's failure to ensure that its entries were correct was at least the result of negligence on its part, constituting a violation of 19 U.S.C. §1592. The court further finds that that failure was material to the orderly and proper assessment and collection of duties by the Customs Service.

III

Part of Yuchius's defense has been that it sought to make prior disclosures under the Tariff Act and that it was "whipsawed" by the Service's changing position in regard thereto and the outright rejection of a second attempted such disclosure. See Post-Trial Submission of Defendant Yuchius, pp. 9-12. The maximum civil penalty for violations of the statute due to negligence is

(**A**) the lesser of--

(**i**) the domestic value of the merchandise, or

(**ii**) two times the lawful duties, taxes, and fees of which the United States is or may be deprived . . ..

19 U.S.C. §1592(c)(3).  However,

[i]f the person concerned discloses the circumstances of a violation of subsection (a) of this section before, or without knowledge of, the commencement of a formal investigation of such violation, with respect to such violation, merchandise shall not be seized and any monetary penalty to be assessed under subsection (c) of this section shall not exceed--

*    *    *

(**B**) if such violation resulted from negligence . . . , the interest (computed from the date of liquidation at the prevailing rate of interest applied under section 6621 of Title 26) on the amount of lawful duties, taxes, and fees of which the United States is or may be deprived so long as such person tenders the unpaid amount of the lawful duties, taxes, and fees at the time of disclosure, or within 30 days (or such longer period as the Customs Service may provide) after notice by the Customs Service of its calculation of such unpaid amount.

The person asserting lack of knowledge of the commencement of a formal investigation has the burden of proof in establishing such lack of knowledge.  For purposes of this section, a formal investigation of a violation is considered to be commenced with regard to the disclosing party and the disclosed information on the date recorded in writing by the Customs Service as the date on which facts and circumstances were discovered or information was received which caused the Customs Service to believe that a possibility of a violation of subsection (a) of this section existed.

19 U.S.C. §1592(c)(4).

A

To address first the issue of prior disclosure under this section 1592(c)(4), defendant Yuchius claims that it

did not tender lost duties when it submitted PD2 to Customs on September 28, 1993, because the amount of any lost duties was at that point unclear. When Yuchius submitted PD2, Yuchius believed that the difference between the booked cost of its foreign purchases and the entered value was not dutiable, because this difference consisted of commissions and payments for training and technical assistance. Also, at that time, Yuchius' ability to calculate the lost revenues was hampered by shortcomings in its record-keeping practices.[12]

Whatever the veracity of this position, neither the statute on its face nor the evidence adduced at trial in connection therewith counsels the relief defendant Yuchius seeks. Upon meeting with the company's president and also its senior vice-president, the ISET member came to conclude that there was not acceptable support for the discrepancies at issue, and Yuchius was informed that an enforcement proceeding would likely commence against it. RAD thereupon produced a preliminary report on April 12, 1993, documenting undervaluation for 1992 and calculating the loss of revenues at $242,987. The report states that the importer had agreed to pay this amount and also to disclose for four other years. As indicated above, Yuchius took the position that most of the discrepancy between booked foreign purchase costs and value

---

[12] Post-Trial Submission of Defendant Yuchius, pp. 9-10. The reference "PD2" is to a second claimed attempt by the company at prior disclosure.

The first such attempt occurred on March 24, 1993, claiming a discrepancy in the amount of $5,138 for fiscal year 1991. See Plaintiff's Exhibit 4, pp. 010003-06.

This six-digit pagination of plaintiff's exhibits is the result of its usage of a Bates® automatic numbering machine.

declared on entries was due to commissions, technical assistance, and training.  See Plaintiff's Exhibit 15, p. 011303.  However, Customs informed the company that such "cost difference" was dutiable and that the duties owed for 1991 were $248,125 (which figure included the $5,138). See id. at 011304.  Yuchius then made six payments to Customs, totalling $242,987.  See id. at 11342-43. RAD issued its final report for that fiscal year and stated that the Service's audit had been expanded to cover the other fiscal years 1989 through 1993.  See id. at 011304.  Yuchius then admitted that it had failed to disclose $8,916,794 during that period, but reiterated its belief at the times of the entries that that total cost difference was not dutiable.  See id.

Customs completed its audit in October 1993, by which time the period of limitations had run as to the fiscal year 1988. It concluded that Yuchius had not maintained sufficient records to determine the actual price paid on an entry-by-entry basis.  There had been a failure to identify the undervaluations by entry number, port of entry, date of entry. Total undervaluation was found to be $10,252,462.00.  However, the Service only reported loss of revenues for the four fiscal years beginning February 1, 1989, namely $569,431.

The second attempt at prior disclosure occurred on September 28, 1993, whereupon Customs examined the related imports. See Plaintiff's Exhibit 15, p. 011322.  Defendant Yuchius now

argues that the reason it failed to submit any duties owed is that continuing negotiations through January 30, 1996 gave it the impression that the deadline for tendering them had been extended by Customs. See Post-Trial Submission of Defendant Yuchius, p. 5, para. 14.

ISET agreed with the Service auditors that Yuchius had not made a proper disclosure of all the circumstances of its imports and advised that the September 1993 attempted prior disclosure was not valid. See Plaintiff's Exhibit 15, p. 011296. Customs thereafter issued Yuchius a prepenalty notice, demanding duties in the amount of $328,665 and indicating that it was considering a $1,153,580 penalty, twice the calculated loss of revenues. See Plaintiff's Exhibit 17; Defendant Yuchius Exhibit 5. The Service also issued a demand for duties and fees. The company submitted a response, claiming that there had been double-counting of an accrual for 1992 and arguing that its undervaluation was the result of poor recordkeeping, in essence, a mistake of fact or clerical error. See Defendant Yuchius Exhibit 6; 19 Tr., pp. 91-92. Yuchius requested an extension of time for tender but did not receive one. A formal penalty notice issued on June 13, 1995, plaintiff's exhibit 23. Yuchius petitioned for relief, offering to remit the lost revenues. See Plaintiff's Exhibit 24. The district office forwarded the petition to Customs Headquarters for final decision, and on January 26, 1996, it provided Yuchius with a draft

of its decision, which indicated denial of the petition.  The stated reason was that, although Headquarters believed that, contrary to the port director's determination, the circumstances of the violation had been disclosed to the best of the company's knowledge, Yuchius had not tendered the outstanding duties owed, as required by the prior-disclosure regulations.  See Defendant Yuchius Exhibit 4, pp. 3-4.  The draft also noted that because the statute of limitations was set to expire with respect to some entries, the matter would be referred immediately to the Department of Justice for collection.

Yuchius offered to enter into an agreement with Customs, waiving any time defense for the entries which was about to materialize and providing that the company pay the loss of revenues and an interest-based penalty only.  See Plaintiff's Exhibit 27. On January 30, 1996, one day before the period of limitation was to expire, Yuchius refused to provide the waiver[13], and therefore, on that same day, Customs formally determined that the attempted prior disclosure was not valid for failure to tender the duties owed. See Plaintiff's Exhibit 30.

That denial was pursuant to 19 C.F.R. §162.74(h) (1996), which required that a person disclosing the circumstances of a violation tender any actual loss of duties at the time of disclosure or within 30 days after Service notification of its calculation

---

[13] See Plaintiff's Exhibit 28, p. 011399.

of the actual loss.  Defendant Yuchius claims it could not have made such tender at the time of its second attempted disclosure to Customs on September 28, 1993 because it believed that the commissions and payments for training and technical assistance were not dutiable and that, when it was notified of the actual amount by the Service, the prepenalty notice had already been issued.  See Post-Trial Submission of Defendant Yuchius, pp. 9-10.  Of course, the company has acknowledged that the very reason why the amount owed was difficult or impossible to calculate was its own inadequate recordkeeping.  Nonetheless, it argues now that

> [t]endering the lost revenues . . . --even if Yuchius and Customs had reached an agreement as to their amount-- would not have perfected the prior disclosure.  By the time Customs Headquarters concluded that PD2 was substantially complete after all, it was too late to tender the duties.

Id. at 12.

In its second attempted prior disclosure, the company admitted failing to account for some $8,916,794.  The final audit report dated October 14, 1994[14] set forth the total as $10,252,462, the prepenalty notice was dated February 16, 1995[15], and on January 26, 1996, Yuchius was negotiating an interest-based penalty only with Customs but refused to provide the limitations waiver one day before the statute was to run, and still the outstanding duties had not been tendered.  See Defendant Yuchius Exhibit 10.

---

[14] See Defendant Yuchius Exhibit 13.

[15] See Defendant Yuchius Exhibit 5.

There was no requirement under 19 C.F.R. §162.74(h)(1996) that the tender of the duties be tied to an importer's belief that disclosure would be effective.  Indeed, the obligation to pay duties exists independent of any penalty imposed.  See United States v. Blum, 858 F.2d 1566 (Fed.Cir. 1988).  See also TIE Communications, Inc. v. United States, 18 CIT 358 (1994); United States v. Snuggles, 20 CIT 1057, 937 F.Supp. 923 (1996).  Defendant Yuchius's position that it was "whipsawed" by the decision of the port director, later overruled by Customs Headquarters, regarding the adequacy of the disclosure of the circumstances of the violation does not obviate tender.  The requirement is clear and unambiguous.  If the company believed that Customs was wrong about the adequacy of the disclosure of the circumstances, it could have and should have paid the duties and continued to pursue its position.  It claims to have deferred tender for a good reason, namely, that if it paid an amount which was later determined to be greater than necessary, refusal of the Service to refund would not have been a protestable decision.  While the law on the point may be uncertain[16], tender of duties is still required to qualify for prior-disclosure treatment.  Defendant Yuchius cannot take the position that it believed that the amounts for commissions and technical and training expenses were not dutiable, and delayed

---

[16] See, e.g., Bridalane Fashions, Inc. v. United States, 22 CIT 1064, 32 F.Supp.2d 466 (1998).

paying in the hope of substantiating its view, because it never had support for that position, and has not proven otherwise herein.

The company may have believed that Customs negotiations with it meant that tender could wait, but it has produced no evidence or testimony in support thereof. On the contrary, it was reaffirmed at the trial that the Service "always take[s] the money." 19 Tr., p. 80. Moreover, there is no evidence that acceptance of the monies paid thus far constituted a waiver or an attempt to mislead Yuchius about the status of prior disclosure. There is also no evidence that there was an extension granted pursuant to 19 C.F.R. §162.74(h). Finally, the company did not actually disclose the circumstances of its violation(s) until after Customs had begun an investigation. While the Service may have been willing to proceed on the basis of a prior disclosure, accompanied by appropriate tender, technically, the period had passed for Yuchius to qualify therefor.

B

Congress has chosen to adopt only maximums, as opposed to prescribing precise penalties, for proven violations under 19 U.S.C. §1592 and has left any imposition thereof to the exclusive jurisdiction of the Court of International Trade. And the court has understood the purpose of this approach essentially to be remedial rather than punitive. E.g., United States v. Gordon, 10

CIT 292, 297, 634 F.Supp. 409, 415-16 (1986).  Moreover, the court has compiled an exhaustive list of considerations that might apply in a given case, including a defendant's good faith effort to comply with the statute, a defendant's degree of culpability, a defendant's history of previous violations, the public interest in ensuring compliance with the law, the nature and circumstances of the violation(s) at issue, a defendant's ability to pay, the potential impact of a penalty on a defendant's ability to continue in business, that a penalty not be shocking to the conscience, the economic benefit of the violation(s) to a defendant, the degree of harm to the public, and the value of vindicating agency authority. See United States v. Complex Machine Works Co., 23 CIT 942, 949-50, 83 F.Supp.2d 1307, 1314-15 (1999).

Agency authority may be down this list, but that circumlocation cannot be interpreted to mean that it is not a paramount consideration and concern of this court.  Indeed, the multifarious tasks and enormous responsibilities of the U.S. Customs Service are much too daunting to permit the lack of reasonable care *cum* negligence reflected by the record in this case to go without correction.  Perhaps, the extended administrative process, and then this case itself, have already had a remedial impact upon defendant Yuchius and its principals.  None of them, however, presented him- or herself herein for closer court scrutiny on this issue. Instead, they have relied upon their privilege to have accountants

and attorneys do their reckoning.  And the latter have carried out their assignments admirably.  Counsel have not sought to deny the undeniable, rather to minimize the damage that emanates therefrom. They have sought to portray their client(s) as unsophisticated, not well-educated, too busy to have kept complete and proper track of all that matters to Customs.[17]  They understand (and have stipulated) that the Service is still owed duties in the amount of $321,306.00 plus interest thereon.  Whereupon, they propose that,

> if any penalties are assessed, the maximum permissible amount is $642,306, twice the amount of the loss of revenue in the second disclosure period.

Post-Trial Submission of Defendant Yuchius, p. 8, para. 5.


On its part, the plaintiff continues to "seek the maximum penalty of two times the lawful duties that the United States was deprived"[18], which it computed in the pretrial order to be $569,-431.00 x 2 = $1,116,454.00[19].  While both sides appear to continue to have difficulty with their arithmetic, the logic and analysis in support of their respective positions are clear enough.  Both rely on the factors of the Complex Machine Works case, supra, albeit to divergent final penalty amounts.

---

[17] While these insinuations may all be true, the court is required to remind the defendant that none of them can be the basis of an acceptable defense.

[18] Plaintiff's Post-Trial Submission, p. 20.

[19] Pre-Trial Order, p. 6.

Taking those considerations into account, and comparing them with the specific facts of this case, the court concludes that the maximum penalty multiplier should apply -- but only to the net lost revenues stipulated by the parties, supra, $321,306, equals a penalty of $642,612.00 that the government of the United States of America should collect from defendant Yuchius. While the company's disclosure of the circumstances of some of its violations may have been "substantially complete and effective"[20], as Customs Headquarters came to conclude, the record developed herein as a whole still counsels a penalty of this magnitude.

IV

As set forth hereinabove, defendant Intercargo Insurance Company has already settled its obligation to the plaintiff under its bond. Whereupon it cross-claims herein against co-defendant Yuchius for the amount thereof, plus interest thereon from the date of payment, as well as reasonable attorney's fees and costs and expenses for pretrial preparation, trial participation, and presentation of the cross-claim.[21]

A

Cross-claimant Intercargo presses two paths to recovery, to wit, its indemnity agreement with Yuchius, and implied contract

---

[20] Defendant Yuchius Exhibit 4, p. 3.

[21] The court notes in passing that its jurisdiction over this claim has not been extinguished by the cross-claimant's settlement with the plaintiff. See, e.g., Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1204 and n. 2 (5th Cir. 1975).

between principal and surety.  According to the agreement produced

at trial as exhibit INT-5, Yuchius Morality Company, Ltd. did

> bind itself, it successors and assigns, to indemnify and
> save [Intercargo Insurance] Company harmless . . . and on
> demand to pay it any and all claims, demands, loss and
> damages of every nature and kind, and on demand to pay it
> all legal and other costs, counsel fees and expenses
> directly or indirectly, which the Company shall at any
> time sustain by reason or in consequence of such surety-
> ship, or any renewal, extension, modification or continu-
> ation thereof, or Consent of Surety or additional surety-
> ship, . . . whether before or after legal proceedings by
> or against the Company, and without notice thereof to the
> undersigned [Yuchius].

> *    *    *

> The undersigned [Yuchius] hereby agrees to indemnify
> the Company for any and all expenses, costs and attor-
> ney's fees incurred by the Company in the event that the
> Company is compelled to exercise any of its available
> remedies to ensure compliance with the terms and condi-
> tions of the bond.

On its face, this agreement binds Yuchius to indemnify its surety

in this matter.

Moreover, the Restatement (Third) of Suretyship and

Guaranty §22(1)(b) indicates that there is an obligation to

reimburse a secondary obligor when it makes a settlement with the

obligee that discharges the principal obligor, in whole or in part,

with the respect to the underlying obligation.  This court's

granting of partial summary judgment to the plaintiff for unpaid

duties covered by the Intercargo bond, and the subsequent penalty

trial, established that the time for satisfaction of the obligation

had arrived.  See Restatement (Third) of Suretyship and Guaranty

§22(2).  Defendant Yuchius claims that the settlement was premature in the absence of court disposition of its defenses herein.  Cf. id., §24.  It also claims that

> the question of the payment of lost duties became intertwined with Customs' penalty demands from the very outset, and that Yuchius has not been able to resolve one question without also resolving the other.  Under these circumstances, it is premature to conclude that Yuchius has breached its duty of performance to Intercargo, and thus exoneration would not be appropriate under Section 21(2) of the Restatement.

Post-Trial Submission of Defendant Yuchius, p. 27.

Of course, defendant/cross-claimant Intercargo has already incurred the expenses of the trial (and the settlement).  Hence, its cross-claim is not now premature.  While section 24(1)(e) of the Restatement does set forth a defense to a demand for reimbursement when, at the time of a settlement of a secondary obligation, the secondary obligor had notice of a defense of the principal obligor to the underlying obligation[22], the surety takes the position that this court's slip opinion 99-79 dismissed any such defense of defendant Yuchius even before the trial.  As for the trial, the defendant/cross-claimant has pointed to the other

---

[22] Cf. Restatement (Third) of Suretyship and Guaranty §24-(3):

> Notwithstanding subsection (1)(e), if the secondary obligor gives the principal obligor notice of the obligee's claim and an opportunity to defend against it, the principal obligor may not assert, as a defense to its duty to reimburse the secondary obligor, any defense to the underlying obligation that was available to the secondary obligor as a defense to the secondary obligation.

parties' difficulties, even failures, to match entries covered by its bond with duties owed. Notwithstanding this systemic shortcoming of the record, the surety still presses its settlement now as a "reasonable business decision". Post-Trial Brief by Defendant and Cross-Claimant Intercargo, p. 11. Given the facts and circumstances adduced herein[23], this court cannot disagree.

Defendant Yuchius contends that the defendant surety's defense of this action was voluntary. The court cannot concur. The failure-to-match defense asserted by Intercargo was hardly volitional, nor does the record reflect inadequate or improper evaluation of the liabilities in the case prior to any tender. Defendant Yuchius also takes the position that the efforts of the defendant/cross-claimant's counsel were duplicative, but this assertion also cannot stand in the light of their aforesaid, original defense and their extensive cross-examination of government witnesses. See 19 Tr., pp. 80-141; 20 Tr., pp. 101-34. Unlike the case cited by defendant Yuchius in support of its position, Sentry Ins. Co. v. Davison Fuel & Dock Co., 60 Ohio App.2d 248, 396 N.E.2d 1071 (1978), defendant/cross-claimant Intercargo's counsel did not agree that the principal's counsel was competent to represent it in all phases of this litigation, including those inherently tied to the bond. Clearly, the decision

---

[23] For example, at the time of its settlement for the $50,-000 face value of its bond, the surety was still confronted with a Customs demand for $67,844.44. See Intercargo Proposed Findings of Fact and Conclusions of Law, p. 2. Cf. Exhibit INT-1.

in regard thereto was within the surety's discretion, and this court cannot find that the resultant approach was out of order.

Defendant Yuchius is of the view that exoneration of its surety would not be appropriate in the absence of an attempt to collect from the principal and of a showing that the remedy at law is inadequate, and that remittance to defendant/cross-claimant Intercargo is not the appropriate form of relief. It argues that the case, Milwaukie Constr. Co. v. Glen Falls Ins. Co., 367 F.2d 964 (9th Cir. 1966), cited by the surety, is inappropriate as the exoneration remedy referred to therein was granted in circumstances where that surety did not know what the final amount would be and so did not have an adequate remedy at law, and in the circumstances where there was an impending threat of the principal's absconding. However, that case is not limited to such circumstances, to wit:

> ". . . The doctrine in such cases rests on the simple right, as between the principal and surety, that the surety has to be protected by the principal; a surety is awarded exoneration in order that mischief and circuity of action may be avoided; he is not obligated to make inroads into his own resources when the loss in the end must fall on the principal.
>
> It is not essential that the claim of the surety for relief should depend on the fact that he will incur irreparable injury; nor must he show any fraudulent disposition of property, or the presence of a wrongful purpose, or special reason for fearing loss; and the insolvency of his surety will not preclude him from maintaining the bill."

367 F.2d at 966, reciting 72 C.J.S., Principal and Surety §303

(1951).  And also quoting Judge Learned Hand's opinion in <u>Admiral</u>

<u>Oriental Line v. United States</u>, 86 F.2d 201, 204 (2d Cir. 1936),

in equity

> the rule is otherwise; before paying the debt a surety
> may call upon the principal to exonerate him by discharg-
> ing it . . ..

367 F.2d at 967.  <u>See</u> <u>also</u> <u>Morley Constr. Co. v. Maryland Casualty</u>

<u>Co</u>., 90 F.2d 976 (8th Cir. 1937).

In this case, to avoid the circuity referred to,

indemnification is appropriate.  The debt has matured, the surety

has paid out funds in settlement, and therefore defendant Yuchius's

arguments relating to the exoneration remedy are not apposite.

<u>See</u>, <u>e</u>.<u>g</u>., <u>United States v. Almany</u>, 22 CIT 490 (1998).  <u>See</u> <u>also</u>

<u>Borey v. Nat'l Union Fire Ins. Co</u>., 934 F.2d 30 (2d Cir. 1991).

Defendant Yuchius further argues that the form of relief

requested by Intercargo is not contemplated by the Restatement

(Third) of Suretyship and Guaranty §21(2), Comment (k), which

states:

> . . . The relief granted, when exoneration or *quia timet*
> rights are asserted, depends on the facts of the particu-
> lar case.  . . .  Among the courses open to the court are
> to direct performance by the principal obligor, to
> require that a sum certain due the obligee by the
> principal obligor be paid into court for the obligee, or
> to require that the principal obligor give the secondary
> obligor adequate security for its ultimate reimbursement.

However, since the amount at issue herein is now a sum certain, it

would serve no purpose to require payment into court of monies or

to furnish security.  Judgment should simply be entered on behalf of defendant/cross-claimant Intercargo Insurance Company directly.

B

The Restatement (Third) of Suretyship and Guaranty §23(1) envisions a principal obligor's reimbursement of a secondary obligor for the "reasonable cost of performing the secondary obligation, including incidental expenses".  Here, the surety claims that the $13,146.30 requested is a reasonable sum spent in its defense of the claims against defendant Yuchius prior to the trial, and it also seeks reimbursement for trial preparation, the subsequent conduct thereof, and the reasonable fees and expenses incurred in pursuing its cross-claim.  Comment (a) to the Restatement's section 23(1) states that the duty to reimburse a secondary obligor encompasses incidental expenses, which "may include reasonable attorneys' fees incurred in conjunction with performance of the secondary obligation".

(1)

As this court, contrary to the claim of defendant Yuchius, does not find Intercargo's defense to have been "voluntary", attorney's fees of $13,146.30 incurred up to the date of trial[24] are clearly recoverable, as are such fees engendered by the government's trial itself.

---

[24]  See Exhibit INT-4.

(2)

With regard to recovery of attorney's fees and expenses in pursuit of the cross-claim, cases that have allowed them have relied upon the language of any indemnity agreement.  See, e.g., John Burr v. Alexander Lichtenheim, 190 Conn. 351, 460 A.2d. 1290 (1983).  In the matter at bar, that agreement's reference to indemnification for "any and all expenses, costs and attorney's fees incurred by the Company in the event that the Company is compelled to exercise any of its available remedies to ensure compliance" is sufficiently broad[25], and the court therefore finds such fees and expenses to be recoverable by cross-claimant Intercargo.

Where, as here, there is such an agreement, case law does require that it was reasonably necessary for a surety to have incurred attorney's fees and expenses.  E.g., Fallon Elec. Co. v. The Cincinnati Ins. Co., 121 F.3d 125 (3d Cir. 1997).  See also Sentry Ins. Co. v. Davison Fuel & Dock Co., supra.  And this court so finds on the record developed.[26]

V

The plaintiff seeks prejudgment interest from February 16, 1995 on the $321,306 in lost revenues.  Defendant Yuchius has

---

[25] The same can be said of the agreement in Sentry Ins. Co. v. Davison Fuel & Dock Co., 60 Ohio App.2d 248, 396 N.E.2d 1071 (1978), upon which defendant Yuchius attempts to rely.

[26] Of course, before any award thereof, defendant/cross-claimant Intercargo must serve and file a detailed accounting, which will be subject to examination by defendant Yuchius.  Cf. Sentry Ins. Co. v. Davison Fuel & Dock Co., supra note 25.

admitted that it owes the plaintiff lost duties since at least September 28, 1993.  See Plaintiff's Exhibit 13, p. 011214.  The duties were demanded on February 16, 1995.  See Plaintiff's Exhibit 17, p. 011352.

Award of such interest is within the equitable powers of the court.  See, e.g., United States v. Imperial Food Imports, 834 F.2d 1013, 1016 (Fed.Cir. 1987); Rheem Metalurgica S.A. v. United States, 21 CIT 963, 966, 978 F.Supp. 333, 336, aff'd, 160 F.3d 1357 (Fed.Cir. 1998); United States v. Utex Int'l Inc., 11 CIT 325, 329, 659 F.Supp. 250, 254 (1987), rev'd on other grounds, 857 F.2d 1408 (Fed.Cir. 1988); United States v. Goodman, 6 CIT 132, 139-140, 572 F.Supp. 1284, 1289 (1983).  That is, it is appropriate to reimburse the government for what has been essentially a loan to the defendant. E.g., United States v. Imperial Food Imports, 834 F.2d at 1016; United States v. Goodman, 6 CIT at 140.  See also Wallace Beerie & Co. v. United States, 12 CIT 103, 107 (1988).  In this case, there has been no unreasonable delay on the part of the government.  Whereupon, the plaintiff should recover prejudgment interest from defendant Yuchius since February 16, 1995.

VI

The parties are hereby directed to settle and submit within 30 days hereof a proposed final judgment in conformity with this opinion, which represents the court's findings of facts and conclusions of law, awarding (a) the plaintiff lost revenues and

prejudgment interest thereon, as well as the penalty for the proven negligence of defendant Yuchius Morality Company, Ltd., and (b) defendant/cross-claimant Intercargo Insurance Company the amount of its bond plus the reasonable fees and expenses of its attorneys and costs incurred before trial, as well as interest thereon and such reasonable fees and expenses as may have been incurred since that time and which have been set forth in an application therefor duly served and filed within the aforesaid 30-day period in conformity with the CIT Rules.

So ordered.

Decided:  New York, New York
          October 18, 2002

_____
Judge